## Douthett v. Fort Pitt Gas Company, Appellant.

*Oil and gas lease—Construction—Parol evidence.*

Where a contract provided that a well sunk in oil and gas land should under certain conditions be operated as an oil well and belong to one of the parties, and if oil should not be found, the other party should drill deeper into another strata, the oral evidence of experts and practical producers of oil and gas in the oil and gas belts is admissible, not to change, modify or contradict the writing, but to show the surroundings of the parties at the time the contract was made, and thus aid the court in the interpretation of the written agreement.

In such a case it is proper to show that in the region in which the land was situated oil was found in a particular strata of sand, and if not found there was not likely to be found at all, and that when the well reached this strata it was proper to have the well tested by " shooting," unless it was made to appear that such treatment would seriously jeopardize the further drilling of the well in case oil was not found, and it was necessary to drill to a lower strata. If the court finds from such evidence that a test by " shooting " was proper under the circumstances, the appellate court will not reverse the finding.

Argued April 22, 1902.   Appeal, No. 48, Oct. T., 1902, by defendant, from decree of C. P. No. 1, Allegheny Co., Sept. T., 1901, No. 421, on bill in equity in case of Lemuel Douthett, trading as The Thorn Hill Oil Company v. Fort Pitt Gas Company.   Before DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ.   Affirmed.

Bill in equity for an injunction.

STOWE, P. J., filed the following opinion:

The plaintiffs under the name of the Thorn Hill Oil Company are joint owners of certain leaseholds and properties for oil and gas purposes ; one under a lease from Mary A. Douthett for forty acres, more or less, dated November 3, 1900, and another from C. Weldon, for sixty acres, more or less, dated June 26, 1900.   On February 25, 1901, plaintiffs entered into a written agreement with the Rochester Tumbler Company wherein, for $3,000 in money and other considerations, they assigned and transferred to the tumbler company all the gas rights covered by said two leases on the farms of Douthett and Weldon, in-

cluding the gas rights in the well then drilled on said Douthett
farm, together with the rig and casing therein.

As a further consideration the tumbler company agreed to
drill a well on the Douthett farm, commencing within sixty days
from said date and to prosecute the same to completion with due
diligence, the agreement containing the following provisions :

1. If the well produces no oil, the same to be at the cost of
the tumbler company.

2. If the well produces less than ten barrels per day of oil,
it was to belong to plaintiffs upon payment to the tumbler com-
pany for the rig and casing at well values; the rig not to cost
more than $200.   The drilling to be at the cost of the tumbler
company.

3. If the well produces more than ten barrels per day, the
plaintiffs shall pay the cost of rig and casing at well values;
the rig not to exceed the cost of $200, and also pay the cost of
drilling, and said well shall belong to plaintiffs.

4. If neither gas nor oil are found in paying quantities sooner,
the defendants shall drill well into the fourth sand.

The tumbler company commenced the drilling of a well on
the Douthett farm in pursuance of this agreement about May,
1900, and drilled it through what is known as the hundred foot
sand, which appears to be the sand in which almost all the oil
produced in that section of country is found.    The evidence
sufficiently shows that there were such indications of oil at
this point to justify the conclusion that with proper treatment
by " shooting " or exploding torpedoes at this point, oil might
be found in paying quantity.   The plaintiffs demanded the
right to "shoot" the well, before defendants should drill
further for the purpose of determining whether oil could be
obtained in this sand, which defendants refused to allow, and
thereupon plaintiffs filed this bill and obtained an injunction
preventing the defendants from further drilling the well until
plaintiffs had been allowed to fairly test said well, or have it
tested for oil, in said sand.   No test has yet been made, and
the drilling has been stopped, and there the matter stands to
this day, when the case comes up for determination on final
hearing as to whether defendants shall be allowed to proceed
with drilling the well before the plaintiffs shall be allowed to

test in this hundred foot sand for oil by shooting or torpedoing it in this sand.

The evidence satisfies us that the general understanding of oil men in this district at the time this agreement was entered into was that oil was nearly always found in this hundred foot sand, if found at all, and that if it was not found there it was not likely to be found at all. It is clear the well could not be operated as both an oil and a gas well. It must be one or the other, and therefore we think the contract should be construed in view of that fact, and that plaintiffs should have the right when the indications fairly promised oil, and the reasonable probability was it would be found in paying quantity to have the well tested in the proper and usual manner by " shooting " unless it is made to appear from testimony that such treatment would seriously jeopardize the further drilling of the well in case oil was not found and it was necessary to drill to the fourth sand.

How then does the evidence stand upon this question?

We must here note that defendants do not deny the right of plaintiffs to test the well at some time, but claim that they should not do so until the drilling has gone to the fourth sand, or at least below where it has now been drilled, alleging that such test was dangerous to the further drilling of the well and, if not productive of sufficient oil to pay, would stop its further development by destroying it, and thus prevent them having the benefit of their agreement, and also aver that in such cases as this, that is not only the safer course, but is the one usually adopted under similar circumstances. Considerable testimony was given to show that persons contracting to drill wells will not allow " shooting " tests as they drill unless specially provided for in their agreement, but we have no evidence at all in regard to such a case as this. So far as the evidence tends to show, the danger to the well by shooting it is well enough, but it fails to throw any light upon the proper construction of this particular agreement in any other respect. While the evidence satisfies me that there is some danger in " shooting " a well in the situation this one is in, if not carefully and properly done, it appears to me to be the usual course and that the danger is not so great as to justify us in saying that it was not intended to be allowed under this agree-

ment.   Taking it all together we think the fair interpretation
of this agreement is that plaintiffs have the right to secure oil
in this hundred foot sand if it can be done by "shooting," that
such is the usual course under similar circumstances for test-
ing a well for oil, and that the danger to the further drilling
of the well by such shooting is not such as should prevent it
now being tested by plaintiffs before further drilling is done
by defendants, and therefore are of opinion that plaintiffs are
entitled to the relief prayed for.   We further think that the
findings of facts requested by plaintiffs are correct as also the
conclusions of law arising therefrom, and therefore affirm the
same, and the prothonotary is now directed to enter a decree
sec. reg. in accordance with this opinion.

*Error assigned* was the decree of the court.

*William H. McClung*, with him *Edwin S. Craig* and *Ralph
Longenecker*, for appellant.

*W. H. S. Thomson*, with him *John W. Thomas*, for appellee.

Per Curiam, April 28, 1902:
This is by no means a one sided-case.   Its decision rests on
the interpretation of the written agreement of February 25,
1901.   As an aid to such interpretation, the court heard oral
evidence of experts and practical producers of oil and gas in
the oil and gas belts ; not to change, modify or contradict the
writing, but merely as explanatory thereof ; in other words, to
show the surroundings of the parties at the time their minds
were brought to assent to the same thing.   This kind of evi-
dence is always admissible in the interpretation of such writings.
The subject of it is not well known to any, but those engaged
in the particular business which gives rise to the contract.
Many phases of that business are so familiar to the parties,
that knowledge of them is assumed, on the part of all others
as well as by courts ; hence, what is implied in the minds of
the contracting parties is often not expressed in the writing,
and hence also the admissibility of oral evidence.   The learned
judge of the court below in his opinion says :
   " The evidence satisfies us that the general understanding of

oil men in this district at the time this agreement was entered into was, that oil was nearly always found in this hundred foot sand, if found at all, and if it was not found there it was not likely to be found at all. It is clear the well could not be operated as both an oil and a gas well. It must be one or the other, and therefore, we think the contract should be construed in view of that fact, and that the plaintiffs should have the right when the indications fairly promised oil, and the reasonable probability was it would be found in paying quantity, to have the well tested in the proper and usual manner by " shooting " unless it is made to appear from testimony that such treatment would seriously jeopardize the further drilling of the well in case oil was not found and it was necessary to drill to the fourth sand."

He then in his conclusion says : " Taking it all together, we think the fair interpretation of this agreement is, that plaintiffs have a right to secure oil in this hundred foot sand if it can be done by " shooting " ; that such is the course under similar circumstances for testing a well for oil and that the danger to the further drilling of the well by " shooting " is not such as should now prevent its being tested by plaintiffs before further drilling by defendant."

There was evidence on part of the defendant that under the circumstances to shoot the well at the present depth might destroy it, which would be greatly to its loss, and therefore ought not to be implied as a right under the contract. This view has been very ably and plausibly argued by counsel for appellant ; but in an evenly balanced case like this, the opinion of the trial judge who had before him the witnesses is very persuasive with us, and we therefore adopt his opinion.

The decree is affirmed.